BASCHAB, Presiding Judge.
The appellant, James Randall Kelly, was convicted of first-degree theft of property, a violation of § 13A-8-3(a), Ala.Code 1975.[1] The trial court sentenced him to serve a term of seven years in prison, but suspended his sentence and placed him on probation for four years. The appellant *574 did not file any post-judgment motions. This appeal followed.
Patrick Odell testified that, on September 8, 2000, he went to TitleMax and spoke to the appellant; that he obtained a $600 loan; and that he gave the appellant a clear certificate of title and a spare key to his 1994 Jeep Cherokee to secure the loan. He also testified that, when the month ended, because he did not have enough money to pay back the loan, he paid the interest on the loan and rolled the principal amount over to the next month. Over the next several months, he rolled the loan over several times, borrowed some additional money, and paid interest and some of the principal on the loans. Each time, Odell dealt directly with the appellant.
Odell testified that contract number 1712 dated July 25, 2001, showed him taking out an additional $1,000 loan. However, he testified that he did not receive any additional funds on that date and that he did not sign that contract. Odell testified that some of the contracts he signed were not included in the packet of contracts that were presented for him to review in court. He further testified that he ultimately paid off the loan in November 2001. At that time, the appellant gave him the key to his vehicle, but stated that it would take 90 days to get his certificate of title back because he had rolled over the loan several times.
Odell testified that, a couple of months later, he received a telephone call saying that he owed $2,000 on the certificate of title and that someone was coming to take the vehicle. Later that day, the appellant telephoned him and told him that everything was fine, that they had pulled the wrong file, and that he had taken care of it. Odell asked the appellant to provide him with something that showed that his balance was zero, and the appellant did so a few days later.
Odell testified that he later learned that he supposedly owed over $3,000 on the certificate of title; that he discovered that there were five additional contracts with TitleMax in his name that he did not sign; and that there was a key to a Ford vehicle in his file. Finally, he testified that he did not receive the $3,000 he purportedly owed to TitleMax.
On cross-examination, Odell testified that he executed a new contract each time he dealt with TitleMax. He also testified that the contracts indicated that he received loan proceed checks for $1,000 and $2,000 in July 2001, but that he never actually received those checks or that money.
David Deal testified that, in 2000, he was the district manager for TitleMax, and the appellant was a store manager at the Do-than TitleMax. He explained that, when a customer comes in to obtain a loan, an employee will assess the value of the vehicle and come up with a dollar amount that can be borrowed; that they then check the VIN and model number of the vehicle and, if a negotiated price is reached, the customer turns over the certificate of title and a spare key; that the customer can either pay off the loan after thirty days or pay the interest on the loan and roll over the principal amount to the next month; that a new contract is signed for each transaction; and that the files are stored in fireproof cabinets in the main office.
Deal testified that he normally did two store audits each month and examined only part of the files during each audit. However, around February 5, 2002, or February 6, 2002, the appellant told him and a supervisor that “he knew that he was doing things he wasn’t suppose to do, but it was [their] job to find it.” (R. 114.) Therefore, he decided to audit all of the files.
*575 During his audit, Deal discovered that certificates of title, which had previously been in folders, were missing from several folders. When he questioned the appellant about the missing certificates of title, the appellant answered very quickly and said he would take care of it by ordering replacement certificates of title for those vehicles. Afterward, Deal telephoned some of the customers individually and learned that they had paid their accounts in full and received their certificates of title from the appellant, even though their accounts still had an outstanding balance according to TitleMax’s files.
Deal testified that Odell borrowed $600 against a 1994 Jeep Cherokee on September 8, 2000. He did not initially become aware of any problem with Odell’s account because there was a certificate of title and a key in his file. Rather, he was alerted to a problem with Odell’s account when it became past due on February 15, 2002. At that point, he notified Odell and realized that there was a problem because the balance showing due was $3,800 with interest, but Odell had a receipt from the appellant showing that he had a zero balance. In Odell’s file, they found several contracts that Odell had not actually signed; the certificate of title to Odell’s vehicle, even though the appellant had indicated to Odell that it would take ninety days for him to receive it; and a key to a Ford vehicle instead of Odell’s Jeep Cherokee.
On February 7, 2002, Deal fired the appellant because of the discrepancies in various files. The next weekend, someone broke into the TitleMax building; took the towers for computers that had customer information on them, a repossession logbook, backup computer disks, approximately $5,900, and several files; and set the building on fire. A TitleMax customer testified that she saw a pickup truck that matched the appellant’s truck parked beside the building that morning before the store was supposed to open and before the fire was discovered.
Sergeant Tony Luker of the Dothan Police Department testified that he investigated the allegations against the appellant. He explained that it was his understanding that TitleMax issued checks to customers and that it sometimes cashed its own checks. Luker also testified that he did not see any checks related to the theft charge against the appellant.
The appellant testified that he made the loan to Odell and was the primary person who dealt with him. He also testified that, when TitleMax issues money from an account, it does so with a check. The appellant further testified that, if Odell’s account history showed separate advances of $1,000 and $2,000 on different dates, Title-Max would have issued two separate checks for those amounts. Finally, he testified that he did not prepare the receipt that showed that Odell had a zero balance.
The appellant argues that, “[u]nder Alabama law and the indictment issued against [him] for theft of property, the State of Alabama failed to meet its required burden of proof with the evidence that it presented at trial.” (Appellant’s brief at p. 12.) The indictment alleged that he
“did knowingly obtain or exert unauthorized control over A CHECK, the property of TITLEMAX OF DOTHAN, INC., of the value of, to-wit: $3,000.00, with the intent to deprive the owner of said property, in violation of Section 13A-8-3 of the Code of Alabama, against the peace and dignity of the State of Alabama.”
(C.R. 7.) The appellant specifically contends that “it was incumbent on the State to prove that [he] ‘obtained or exerted unauthorized control’ over a check in the amount of $3,000.00 that was the property *576 of TitleMax of Dothan, Inc.” (Appellant’s brief at pp. 8-9.)
At the close of the State’s case-in-chief, defense counsel moved for a judgment of acquittal, arguing:
“First of all, the indictment on the theft case claims that Mr. Kelley exerted unauthorized control over a check in the amount of $3,000. There has not been any testimony offered that there was any or a check that he exerted any kind of control over at all. All we have heard is that there were account discrepancies. The only mention of any check is when I was asking him how they did business and Mr. Luker certainly doesn’t have any idea about who exerted any kind of control or unauthorized use over any kind of check. I think that’s problem. I think that the State failed to prove that particular aspect of the theft case.
[[Image here]]
“... If you do feel there is substantial evidence, I believe there is a fatal variance in the indictment because we haven’t heard any testimony whether that was cash that was exerted by Mr. Kelley or a check. As you know, that specifically has to be mentioned. Again there has been no evidence to my recollection presented as to how exactly this money was supposed to have been stolen other than there was account discrepancies there at TitleMax.”
(R. 255-57.)
At the close of the defense’s evidence, defense counsel renewed his motion for a judgment of acquittal, arguing, in part:
“There has been no evidence entered at all specifically saying how many checks, how much the checks were, how much was cash. It’s just lumped in there all together. And, again, I believe that’s going to be a variance, fatal material variance, which would be fatal to the indictment that Mr. Kelley has been brought here on.
[[Image here]]
“... So again, what I’m getting at, Judge, is the only testimony we heard that had anything to do with $3,000 was a $1,000 advance and then a $2,000 advance from the account of Patrick Odell—
[[Image here]]
“... It does say a check when in fact it had to have been at least two checks because there was two advances and two different amounts.
[[Image here]]
“... I think you would need to reference that it was more than a just a single check if that is, in fact, what the evidence is.
[[Image here]]
“... My point is, it goes back to what I was making out is that I still think there is a potential variance.”
(R. 370-77.)
In his brief to this court, the appellant notes that the State presented testimony that some of the contracts Odell supposedly signed were forged, that the contracts indicated that Odell received an additional $1,000 and $2,000 on two separate occasions, and that Odell did not receive the additional $3,000. However, he asserts that “[t]he State failed to present sufficient evidence that [he] obtained or exerted unauthorized control over a check in the amount of $3,000 which was the property of TitleMax of Dothan, Inc.” (Appellant’s brief at p. 9.) Thus, just as he did when he moved for a judgment of acquittal, the appellant appears to be arguing that there was a fatal variance between the allegations included in the indictment and the evidence presented at trial because the State did not present evidence to establish that he obtained or exerted unauthorized *577 control over a $3,000 check that was the property of TitleMax. We agree.
“A variance in the form of the offense charged in the indictment and the proof presented at trial is fatal if the proof offered by the State is of a different crime, or of the same crime, but under a set of facts different from those set out in the indictment. Ex parte Hightower, 443 So.2d 1272, 1274 (Ala.1983).”
Ex parte Hamm, 564 So.2d 469, 471 (Ala. 1990) (emphasis added).
“A fatal variance exists only where the State fails to adduce any proof of a material allegation of the indictment or where the only proof adduced is contrary to a material allegation in the indictment. Eady v. State, 369 So.2d 841, 843 (Ala.Cr.App.1979), reversed on other grounds, Ex parte Alexander, 475 So.2d 628 (Ala.1985).”
Johnson v. State, 584 So.2d 881, 884 (Ala. Crim.App.1991).
“ ‘The policy behind the variance rule is that the accused should have sufficient notice to enable him to defend himself at trial on the crime for which he has been indicted and proof of a different crime or the same crime under a different set of facts deprives him of that notice to which he is constitutionally entitled.’ House [v. State], 380 So.2d [940] at 942 [ (Ala.1979) ]. ‘Not every variance is fatal. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Reviewing a claim of variance requires use of a two step analysis: (1) was there in fact a variance between the indictment and proof, and (2) was the variance prejudicial.’ United States v. McCrary, 699 F.2d 1308, 1310 (11th Cir.1983). ‘The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to “affect the substantial rights” of the accused.’ Berger, 295 U.S. at 82, 55 S.Ct. at 630. ‘Variance from the indictment is not always prejudicial nor is prejudice assumed.’ United States v. Womack, 654 F.2d 1034, 1041 (5th Cir.1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). The determination of whether a variance affects the defense will have to be made based upon the facts of each case. United States v. Pearson, 667 F.2d 12, 15 (5th Cir.1982).”
Smith v. State, 551 So.2d 1161, 1168-69 (Ala.Crim.App.1989).
In this case, the State presented evidence from which the jury could have reasonably concluded that the appellant used Odell’s account to obtain $3,000 that was the property of TitleMax. However, the evidence did not support even an inference that the appellant obtained one check for $3,000, as alleged in the indictment. Rather, at most, the evidence supported an inference that the appellant obtained separate checks for $1,000 and $2,000. “The unified theft offense created by § 13A-8-2, while reducing the risk of variance between pleading and proof, did not, however, eliminate the necessity for considering such variances as they might pertain to the nature of the property alleged to have been unlawfully controlled.” Ex parte Airhart, 477 So.2d 979, 980 (Ala.1985). Because the indictment alleged that the appellant obtained one $3,000 check and the evidence presented showed, at most, that the appellant obtained two separate checks for $1,000 and $2,000, we conclude that there was a variance between the allegations included in the indictment and the evidence presented at trial and that that variance was prejudicial and therefore fatal. See Ex parte Verzone, 868 So.2d 399 (Ala.2003) (holding that there was a fatal variance where the indictment alleged that Melanie Frazier was the victim of the robbery, but the evidence at trial showed that *578 Juliann Bradford was the victim of the robbery); Ex parte Airhart, 477 So.2d 979 (Ala.1985) (holding that there was a fatal variance where the indictment alleged that the appellant stole currency, but the evidence at trial showed that the appellant stole checks); Delevie v. State, 686 So.2d 1283 (Ala.Crim.App.1996) (holding that there was a fatal variance where the indictment alleged that the appellant stole currency, but the evidence at trial showed that the appellant stole a check); Crump v. State, 30 Ala.App. 241, 4 So.2d 188 (1941) (holding that there was a fatal variance where the indictment alleged that the appellant forged a check for $78, but the evidence at trial showed that the appellant forged a check for $28).
Because there was a fatal variance between the allegations included in the indictment and the evidence presented at trial, we must reverse the appellant’s conviction and sentence. However, we note that the evidence necessary to sustain a conviction for theft of two checks or currency would not be sufficient to sustain a conviction for theft of one cheek, and vice versa. Therefore, double jeopardy principles do not prohibit the State from re-indicting the appellant for the theft of two checks or currency. See Ex parte Wood, 564 So.2d 860 (Ala.1990); State v. Saxton, 724 So.2d 77 (Ala.Crim.App.1998). Accordingly, we reverse the trial court’s judgment and remand this case for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.

. The appellant was also indicted for third-degree burglary and second-degree arson, but the jury found him not guilty of those offenses.